**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ANDREW POLICASTRO,

                        Plaintiff,                  Civ. No.  09-1794 (DRD)

v.                                        **O P I N I O N**

TENAFLY BOARD OF EDUCATION, ET. AL.,

                        Defendants.

*Appearances by:*

ANDREW POLICASTRO
59 Day Avenue
Tenafly, NJ 07670

      *Pro Se Plaintiff*

LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
by: Peter T. Shapiro, Esq. and Gregory Glickman, Esq.
199 Water Street
New York, NY 10038

      *Attorneys for Defendants*

**DEBEVOISE, Senior District Judge**

        This matter comes before the Court on cross-Motions for Summary Judgment pursuant to

Federal Rule of Civil Procedure 56 submitted by Defendants, the Tenafly Board of Education

("the Board"), Dr. Eugene Westlake, and Dr. Theodora Kontogiannis, and Plaintiff, Andrew

Policastro.  Mr. Policastro, a teacher at Tenafly High School ("the school"), claims that

Defendants violated his rights under the First Amendment to the United States Constitution by promulgating a policy requiring teachers to seek permission before distributing personal correspondence through the mailboxes at his school.  On April 2, 2009, he deliberately violated that policy by placing over 100 memoranda in the teacher mailboxes in a transparent attempt to provoke the Defendants into taking disciplinary measures against him that could serve as the basis for this suit.  His efforts were successful:  on April 13, 2009, the Defendants issued an official letter of reprimand informing Mr. Policastro that future violations of the school's mailbox policy might lead to the loss of his tenure.

Mr. Policastro responded on April 15, 2009 by filing a Complaint in which he challenged the policy on the bases that it is vague, overbroad, and unconstitutional as applied to him – and asserted claims based on those contentions against all Defendants under 42 U.S.C. § 1983.[1] Noting that Mr. Policastro had filed a similar suit in 2004, Defendants moved to dismiss on the grounds that his claims in this litigation were barred by the doctrines of res judicata and collateral estoppel.  In a ruling issued July 24, 2009, the Court granted the Defendants' Motion with respect to Mr. Policastro's overbreadth and vagueness challenges, but declined to dismiss his contention that the policy was unconstitutional as applied to him.  See Policastro v. Tenafly Bd. of Educ., 2009 WL 2232525 (D.N.J. 2009) (hereinafter "Policastro I").  Accordingly, only Mr. Policastro's "as-applied" challenge to the policy and his attendant § 1983 claims remain at issue.

Arguing that Mr. Policastro's actions in placing the memoranda in the teacher mailboxes were not protected by the First Amendment, Defendants now move for summary judgment on his remaining claims.  In doing so, they assert that the speech at issue in this case – Mr.

---

[1] Since Mr. Policastro's claims arise under federal law, this Court properly has jurisdiction pursuant to 28 U.S.C. § 1331.

Policastro's dissemination of memoranda through the teacher mailboxes – fails the test for determining whether the First Amendment applies to expressive conduct by teachers and other government employees first announced by the Supreme Court in <u>Pickering v. Board of Education of Township High School District 205, Will County</u>, 391 U.S. 563 (1968).  Under that standard, which the Supreme Court recently refined in <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006), expressive conduct by government employees is protected by the First Amendment if (1) the employee spoke as a citizen, (2) on a matter of public concern, and (3) the employee's interests in disseminating the particular ideas expressed outweigh those of the employer in restricting them.

Citing the fact that "[n]either teachers [n]or students shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 506 (1968), Mr. Policastro argues that the reprimand he received for distributing the memoranda through the teacher mailboxes without first seeking permission violated his rights under the First Amendment.  In support of that argument, he cites a number of cases that are not applicable to his claims either because they were decided by tribunals whose rulings are not binding on this Court, dealt with factual circumstances different from those at issue in this litigation, or both.  Additionally, Mr. Policastro notes the writings of various legal scholars – most of which stand for the general assertion that the First Amendment protects political speech rather than dealing with the specific circumstances at issue here.[2]

For the reasons set forth below, Defendants' Motion for Summary Judgment will be granted.  The legal arguments advanced by both parties are inapposite.  Both the <u>Tinker</u> and

---

[2] Given the complex issues of First Amendment law presented by Mr. Policastro's claims and the fact that he is proceeding <u>pro se</u>, it is understandable that his arguments are not a model of clarity.  In order to elucidate the legal standards applicable to this case and, hopefully, provide Mr. Policastro with some measure of satisfaction, the Court will engage in a more extended discussion of First Amendment jurisprudence than would normally be warranted.

Pickering/Garcetti lines of cases deal with attempts by government officials to restrict speech based on its content.  The parties agree that the mailbox policy in this case was content-neutral – it applied equally to all materials distributed through the mailboxes regardless of their subject-matter.  Accordingly, the policy is best viewed as a time, place, and manner limitation on expressive conduct, and the legality of the Defendants' decision to reprimand Mr. Policastro for violating that policy must be analyzed under the test applicable to such restrictions.  Under that standard, it is clear that Mr. Policastro's actions in distributing the memoranda without first seeking permission to do so were not protected by the First Amendment.  Therefore, the Defendants did not violate his constitutional rights by reprimanding him, and his § 1983 claims must be dismissed.

## I.  BACKGROUND

The facts underlying this dispute were set forth in the Court's July 24, 2009 Opinion, the "background" section of which is incorporated herein by reference.  See Policastro I, 2009 WL 2232525 *2-4.  In order to provide context for today's ruling, some of those facts are repeated below.

**A.  The Policy**

Tenafly High School maintains a central set of mailboxes for the teachers and other staff members who work at that institution.  The room containing the mailboxes is normally open to all school staff.  However, school policy requires that teachers or staff members who wish to distribute mail internally must seek permission before doing so.  Specifically, the policy states that:

> Mailboxes are the property of the Tenafly Board of Education and should be used for school business.  Any staff member wishing to distribute flyers/announcements etc. (via the mailboxes) must have prior approval from the principal or vice-principal.

In addition to their physical mailboxes, teachers may communicate with one another through the school's electronic mail system.  In order to facilitate discussion between the teachers on union matters and other topics of concern, Defendants specifically created a mailing list for that system that omits school administrators.  Teachers are allowed unlimited use of the list, free of charge, to distribute correspondence on any topic.  Mr. Policastro concedes that he uses the electronic mail system regularly to communicate with his colleagues, and that doing so is more convenient than placing physical memoranda in the teacher mailboxes.

**B.  Prior Proceedings**

The long-running and vitriolic dispute between the parties that gives rise to this litigation began on March 13, 2002, when Mr. Policastro used the teacher mailboxes to distribute a memorandum relating to a labor dispute between the teachers at Tenafly High School and their union over the negotiation of a proposed collective bargaining agreement.  The memorandum apparently caused quite a stir among the school's teachers, including a kerfuffle in the library and several arguments.  After receiving several complaints about the memorandum, Dr. Kontogiannis, the school's principal, decided that it was unacceptably disrupting school activities and ordered all copies that had not already been collected from the teacher mailboxes removed.  Shortly thereafter, a teacher reported that copies had been reinserted in the mailboxes. Dr. Kontogiannis again ordered them removed, and locked the mailroom door for the remainder of the school day.

Two years later, on March 14, 2004, Mr. Policastro brought suit in this Court against Dr. Kontogiannis and the Board.   He alleged that that the school's policy of requiring teachers to seek prior approval before placing personal correspondence in the mailboxes was unconstitutionally overbroad and had infringed his rights under the First Amendment in the

5

manner it was applied to him, and asserted a § 1983 cause of action against Dr. Kontogiannis

based on his claim that her removal of the memorandum had violated his constitutional rights.

After a bench trial at which Mr. Policastro appeared pro se, the Honorable Joel A. Pisano

of this Court ruled in favor of Dr. Kontogiannis and the Board.  In doing so, Judge Pisano held

that the school's policy relating to the teacher mailboxes is not unconstitutionally overbroad, and

the application of that policy to Mr. Policastro did not violate his rights under the First

Amendment.  Mr. Policastro sought relief from the Court of Appeals for the Third Circuit, which

on January 24, 2008 affirmed this Court's judgment that the school's policy requiring staff

members to seek permission before placing personal items in the teacher mailboxes is not

unconstitutionally overbroad, and dismissed Mr. Policastro's challenge to the policy as it was

applied to him and § 1983 claims as moot.  See Policastro v. Kontogiannis, 262 Fed. App'x 429,

434 (3d Cir. 2008).  In connection with the latter ruling, the Court of Appeals noted that Mr.

Policastro had not sought damages as part of his § 1983 claim, and held that he was without

standing to seek injunctive relief because the actions that gave rise to his suit were not likely to

recur.  Id. at 434 n.7 ("The prospect of a similar memorandum being removed from teacher

mailboxes under the facts present here is too speculative to warrant invocation of [the 'capable of

repetition yet evading review'] exception" to mootness.).

Dissatisfied with the ruling by the Court of Appeals, Mr. Policastro submitted a petition

for certiorari to the Supreme Court of the United States, which was denied on October 6, 2008.

See Policastro v. Kontogiannis, 129 S. Ct. 46 (2008).  Mr. Policastro then requested that the

Supreme Court stay the judgment of the Court of Appeals.  On January 21, 2009, the Supreme

Court denied that request, see Policastro v. Kontogiannis, 129 S. Ct. 1031 (2009), thus ending

the five years of legal proceedings that resulted from the removal of Mr. Policastro's March 13, 2002 memorandum from the teacher mailboxes.

## C.  The Pending Suit

Or so it seemed.  But, unsatisfied with the ruling by the Court of Appeals that his § 1983 claims were moot because he had not sought damages and the conditions that led to the removal of his March 13, 2002 memorandum from the teacher mailboxes were not likely to recur, Mr. Policastro set out to deliberately manufacture such a recurrence.  He prepared over 100 memoranda comparing the salaries of Tenafly High School teachers to those of educators in the neighboring city of Teaneck.  Each memorandum was enclosed in an envelope on which Mr. Policastro stamped:

> LETTERS OF THE CARRIER
> SENT BY ANDY POLICASTRO
> 39 C.F.R. § 310.3(b)(1)

On the letters themselves, he included a banner message stating, "I DID NOT HAVE ANY PRIOR APPROVAL OF THE PRINCIPAL TO MASS DISTRIBUTE THIS MEMO IN THE TEACHER MAILBOXES."

Despite lacking approval to distribute the memoranda, Mr. Policastro did just that on the morning of April 2, 2009.  Later that day, he sent an e-mail to Defendant Eugene Westlake, the Tenafly Superintendant of Schools, on which he copied Dr. Kontogiannis.  Also copied were Karen Sudol and Joe Ryan, newspaper reporters for, respectively, the Bergen Record and New Jersey Star-Ledger.  In the e-mail, Mr. Policastro framed his actions as a principled stand in support of free speech, stating in relevant part that:

> This morning at 6:55 AM, I placed over 100 memos in the Tenafly High School teacher mailboxes.  This was done by me alone and without incident.  I placed the memos in over 95% of the teacher (teacher, counselors, nurses) mailboxes without any prior approval from the principal or any administrator.

> I am well aware that in May, 2002, Dr. Kontogiannis gave me a verbal directive at a meeting, "that prior approval must be had before placing items in the teacher mailboxes." … I openly disobeyed this directive because it is unconstitutional and abridges my free speech rights as a public school teacher.
>
> …
>
> My use and all NJ teachers' use of the teacher mailboxes without prior approval is a Constitutional right.
>
> …
>
> Judge Pisano's opinions were factually incorrect and did not follow basic tenets of First Amendment law.

Faced with Mr. Policastro's open and repeated flouting of the mailbox policy, the Defendants decided to take disciplinary action.  On April 13, 2009, Dr. Westlake served Mr. Policastro with a written reprimand for insubordination.  The reprimand explicitly invoked the school's mailbox policy and threatened Mr. Policastro with termination in the event of future violations, stating that:

> On April 2, 2009 you placed over 100 memos in the teacher mailboxes at Tenafly High School without receiving permission from the building principal.  You took this action notwithstanding your acknowledgment that your principal, Dr. Kontogiannis, gave you a specific directive that approval must be sought before placing items in the teacher mailboxes.  Her directive is consistent with Board policy on the use of teacher mailboxes.
>
> Your purposeful and willful conduct in disregarding the directive of Dr. Kontogiannis is insubordinate and will not be tolerated.
>
> Therefore you are receiving this written reprimand for your insubordinate behavior.  This reprimand will be placed permanently in your personnel file.  Should you engage in any further insubordinate behavior, the Board will bring tenure charges against you.

Two days after receiving the reprimand, Mr. Policastro filed a Complaint in this Court naming as Defendants the Board, Dr. Westlake, and Dr. Kontogiannis.  In his Complaint, Mr. Policastro asserted the same claims as in his earlier suit – that the mailbox policy is facially

overbroad and unconstitutional as applied to him, and a cause of action under 42 U.S.C. § 1983 alleging that school personnel violated his First Amendment rights by reprimanding him for placing the memoranda in the teacher mailboxes without permission – but added averments that the policy is unconstitutionally vague and a claim for nominal damages in the amount of one dollar.

In lieu of an Answer, Defendants on June 12, 2009 filed two motions.  In the first, they argued that this suit is barred by the doctrines of res judicata and collateral estoppel because the Court rejected Mr. Policastro's overbreadth and § 1983 claims during the 2004 litigation and his challenge to the mailbox policy based on vagueness could have been asserted in that proceeding. In their second motion, Defendants sought sanctions under Federal Rule of Civil Procedure 11 on the grounds that Mr. Policastro's claims in this suit are frivolous – an assertion based wholly on their argument that those claims are barred by res judicata.

On July 24, 2009, the Court granted Defendants' Motion to Dismiss with respect to Mr. Policastro's facial challenges to the mailbox policy based on overbreadth and vagueness, but declined to dismiss his contention that the policy was unconstitutional as applied to him and the § 1983 claims he asserted based on that allegation.  In doing so, the Court noted the similarities between Mr. Policastro's claims in this proceeding and the ones he asserted in the 2004 action, but ruled that his as-applied challenge and attendant § 1983 claims were not barred by res judicata because the Court of Appeals did not address the merits of those claims in its decision affirming this Court's dismissal of that case.  Policastro I, 2009 WL 2232525 at *7-9 (noting that Mr. Policastro's as-applied challenge and § 1983 claims were dismissed as moot).  In light of its ruling that the as-applied challenge and § 1983 claims are not barred, the Court denied Defendants' Motion for Sanctions.  Id. at *10.

## II.  DISCUSSION

Both sides now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the remaining claims – Mr. Policastro's contention that the mailbox policy was unconstitutional in the manner it was applied to him and the associated § 1983 causes of action he asserts against the Defendants for carrying out that application.  In assessing their respective arguments, the Court must apply the standard of review applicable to such motions.

### A.  Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine fact issue exists and a trial is necessary.  Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.  Id. at 251-52.

## B.  Mr. Policastro's First Amendment Claims

As discussed above, Mr. Policastro argues that the Defendants infringed his rights under the First Amendment by reprimanding him for violating the mailbox policy.  In doing so, he relies heavily on the Supreme Court's statement in Tinker, 393 U.S. at 506, that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students."   Based on that principle, he contends that "Tinker, extensive case law, past practice, common sense and the United States Postal Service allow me to use the teacher mailboxes without administrative permission."  (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. 5); see also (Pl.'s Reply Br. Supp. Pl.'s Mot. Summ. J. 13) ("[R]egarding the analysis of teacher free speech, Tinker is controlling.").

The fundamental flaw in Mr. Policastro's argument is his failure to understand that the protections granted by the First Amendment are not absolute.  See, e.g., Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942) ("[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances.").  Some speech is so offensive to the rights of others or utterly without redeeming literary, artistic, political, or scientific value that it is unprotected by the First Amendment.  Even expressive conduct that would normally be entitled to protection may be restricted based on its content in certain situations.  Moreover, when the

speaker is a government employee, he or she may be punished for engaging in expressive conduct that does not relate to matters of public concern as long as the employee's interest in speaking does not outweigh the government's interest in prohibiting him or her from doing so. Finally, the government may impose limitations on the time, place, and manner of expressive conduct as long as those limitations are not based on the content of the speech, are narrowly-tailored, and allow alternative avenues of communication.  The mailbox policy at issue in this case falls into the final category.

### i.    Content-Based Restrictions Generally

It has long been recognized that the content of certain categories of expression – though they may fall under the common understanding of "speech" – places them outside the protection of the First Amendment.  United States v. Stevens, --- U.S. ----, 2010 WL 1540082 at *5 (2010) ("From 1791 to the present … the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never included a freedom to disregard these traditional limitations.") (internal quotations omitted).  Thus, the First Amendment does not apply to obscene speech.  Roth v. United States, 354 U.S. 476, 483 (1957); see also Miller v. California, 413 U.S. 15, 24 (1973) (defining "obscenity" as speech that (1) depicts sexual conduct in a patently offensive way, (2) lacks serious literary, artistic, political, or scientific value, and (3) would be deemed as appealing primarily to prurient interests by an average person applying contemporary community standards.).  Nor does it protect utterances that infringe on the legal rights of others, such as defamation, Beauharnais v. Illinois, 343 U.S. 250, 254-55 (1952), fraudulent representations, Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 771 (1976), incitement to violence, Brandenburg v. Ohio, 395 U.S. 444, 447-49

(1969), or speech integral to criminal conduct.  Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949).

### ii. Content-Based Restrictions on Speech by Teachers and Students

Most importantly for the purposes of this suit, it is well-established that school administrators may impose content-based restrictions on the speech of teachers or students if they "reasonably conclude that speech will 'materially and substantially disrupt the work and discipline of the school.'"  Morse v. Frederick, 551 U.S. 393, 403 (2007) (quoting Tinker, 393 U.S. at 513); see also Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 678 (1986) ("The First Amendment does not prevent [] school officials from determining that to permit a vulgar and lewd speech … would undermine the school's basic educational mission.").  Under that test, which the Court will henceforth refer to as "the Tinker standard," any limitation on the speech of teachers and students must be based on "a specific and significant fear of disruption, not just some remote apprehension of disturbance."  Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 211 (3d Cir. 2001).

The Tinker standard does not govern this case.  The parties agree that the mailbox policy applied generally to all teacher communications regardless of the opinions they expressed or the identity of the speaker, and the reprimand Mr. Policastro received was precipitated by his willful violation of that policy rather than any effort on the part of the Defendants to suppress the ideas contained in his memoranda.  Therefore, the restriction imposed on Mr. Policastro's speech was "content-neutral."  See, e.g., Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642 (1994) (Regulations "that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral."); Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) ("Government regulation of expressive activity is content-neutral as long as

it is justified without reference to the content of the speech.") (quotations and citations omitted); Busch v. Marple Newton Sch. Dist., 567 F.3d 89, 102 (3d Cir. 2009) ("[A] content-neutral regulation places no restrictions on either a particular viewpoint or any subject matter that may be discussed.") (citations and quotations omitted).

In contrast, Tinker dealt with "the prohibition of one particular expression of opinion." 393 U.S. at 510-511 (noting that, in that case, "a particular symbol … was singled out for prohibition," but other symbols were allowed).  While the Court of Appeals for the Third Circuit has never directly ruled that the Tinker standard does not apply to content-neutral restrictions, neither it, the Supreme Court, or any other Court of Appeal has applied that test to any limitation that was not "based, at least in part, on the particular messages students [or teachers] were attempting to communicate."[3]  Jacobs v. Clark County Sch. Dist., 526 F.3d 419, 431 (9th Cir. 2008) ("[N]o reading of Tinker suggests that viewpoint- and content-neutral restrictions on student speech should be subjected to Tinker scrutiny."); see also Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist., 579 F.3d 502, 508 (5th Cir. 2005) (refusing to apply the Tinker standard to a school's dress code because it was content-neutral, and noting the "critical and controlling" distinction that Tinker and Morse "involved a school's targeting specific speech and did not concern content-neutral regulations.").  In fact, the Supreme Court recently engaged in an extended discussion of Tinker and its progeny while holding that a school may restrict student

---

[3] Although the Court of Appeals has never explicitly held that Tinker does not apply to content-neutral restrictions on teacher speech, it has refused in other contexts to apply heightened scrutiny to restrictions that were content-neutral and generally applicable.  See McTiernan v. City of York, Pa., 564 F.3d 636, 646 (3d Cir. 2009) (applying the standard applicable to time, place, and manner restrictions on speech when analyzing First Amendment claims brought by an anti-abortion protester against local police based on their actions in denying pedestrians access to an alley next to an abortion clinic).  In doing so, the Court has noted the lack of "any case in which strict scrutiny has been applied to a 'neutral' and 'generally applicable' regulation restricting the time, place, and manner of religiously-motivated speech."  Id. at 647 n.5 (citing Jacobs, 526 F.3d at 440 n.45).

speech advocating the use of illegal drugs.  See Morse, 551 U.S. at 404-06.  In doing so, it noted with respect to each of the cases in which it has applied the Tinker standard to student expression that the regulation at issue attempted to restrict speech based on its content.  See Id. (discussing Fraser and Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988)).

A different test applies to regulations, such as the one at issue in this case, that impose limitations not on the ideas an individual may express in his or her speech, but on the time, place, and manner in which that speech may occur.  See, e.g., Thomas v. Chicago Park Dist., 534 U.S. 316, 322 (2002) (refusing to apply the same standard used in assessing a licensing scheme that censored speech based on its content to one that did "not authorize a licensor to pass judgment on the content of speech" and was applicable "to all activity conducted in a public park"); Ward, 491 U.S. at 792-93 (ruling that city noise ordinance did not implicate test applicable to content-based restrictions because it "extend[ed] only to the clearly content-neutral goals of ensuring adequate sound amplification and avoiding volume problems" and analyzing ordinance under standard relevant to content-neutral time, place and manner restrictions).  That standard will be discussed at length below, but first the Court will turn to the one whose application is urged by Defendants.

### iii.    Content-Based Restrictions on Speech by Government Employees

The Tinker standard applies to content-based limitations imposed on the speech of teachers and students within schools; a separate but related test is used to assess the legality of content-based restrictions on speech by government employees.[4]  Under the latter, which was

---

[4] It is not entirely clear how the two standards relate to each other.  By its terms, Tinker applies to both students and teachers.  See 393 U.S. at 506 ("First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students.").  That case was decided after Pickering, which dealt specifically with the discipline of a public school teacher.  See 391 U.S. at 574 ("[A]bsent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not

originally articulated by the Supreme Court in <u>Pickering</u> and recently refined in <u>Garcetti</u>, a government employee's speech is protected by the First Amendment if (1) the employee "spoke as a citizen,"[5] (2) "on a matter of public concern," and (3) the employee's interests in freely expressing the sentiments contained in that speech outweigh those of the employer in restricting it. <u>Garcetti</u>, 547 U.S. at 418.  In articulating that test, the Supreme Court recognized that "[w]hen a citizen enters government service, the citizen must by necessity accept certain limitations on his or her freedom."  <u>Garcetti</u>, 547 U.S. at 418.  "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."  <u>Id.</u> Accordingly, "while the First Amendment invests public employees with certain rights, it does not allow them to 'constitutionalize every grievance.'"  <u>Id.</u> at 420 (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 154 (1983)).

Like the <u>Tinker</u> standard, the <u>Pickering</u>/<u>Garcetti</u> test for whether a government employee's speech is protected is only applicable when that speech has been restricted based on its content.  <u>Pickering</u> dealt with the question of whether a teacher could be dismissed for writing

---

furnish the basis for his dismissal from public employment.").  Thus, <u>Tinker</u> may have modified the standard announced in <u>Pickering</u>.  However, the Supreme Court specifically applied the latter case in its most recent decision on the subject, <u>Garcetti</u>.  Moreover, <u>Garcetti</u> applied to "public employees" generally – a group which obviously includes public school teachers.  <u>See</u> 547 U.S. at 417 ("[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." (citing <u>Pickering</u>, 391 U.S. at 568)).  In light of its ruling that neither the <u>Tinker</u> standard nor the <u>Pickering</u>/<u>Garcetti</u> test applies in this case because the mailbox policy was a content-neutral time, place, and manner restriction, the Court will refrain from wading into the interpretive quagmire of attempting to determine which of those standards would govern the validity of a content-based restriction on public school teacher speech.

[5] A government employee speaks as a citizen when he or she "facilitates the expression of a diversity of views from private speakers."  <u>Child Evangelism Fellowship v. Stafford Twp. Sch. Dist.</u>, 386 F.3d 514, 524 (3d Cir. 2004) (internal quotations omitted).  If, however, the employees' speech occurs as part of his or her official duties, that speech will be considered employer-sponsored and will not be protected.  <u>Garcetti</u>, 547 U.S. at 421.

a letter critical of school administrators to a local newspaper.  See 393 U.S. at 566.  In ruling that

he could not, the Supreme Court noted that the teacher's dismissal was based on the content of

the letter, not the mere fact that it had been written.  Id. at 566-67 (stating that the local school

board had "charged that numerous statements in the letter were false and that the publication of

the statements unjustifiably impugned the motives, honesty, integrity, truthfulness, responsibility

and competence of both the [b]oard and the school administration.").  Thus, the restrictions on

speech at issue in Pickering were an attempt to suppress the particular opinions expressed in the

letter, as opposed to a limitation on the time, place, and manner of the teacher's speech.

Garcetti also dealt with disciplinary measures taken against a federal employee based on

the content of his speech.  In that case, a deputy district attorney was subjected to various

adverse employment actions in response to a memorandum in which he recommended that the

charges against a criminal defendant be dismissed based on inaccuracies in an affidavit used to

obtain a critical search warrant.  See 547 U.S. at 413-15.  The discipline was not based on his

actions in having written the memorandum, but rather the fact that its content was viewed as

undercutting the efforts of other prosecutors to convict the suspect.  See Id. at 414 (noting that

the content of the memorandum was the subject of "heated" discussions between members of the

district attorney's office and the employee who wrote it).  In other words, the disciplinary actions

were an effort by the employee's supervisors to restrict the particular opinions he expressed.

The Supreme Court's focus on the content of the speech at issue in Pickering and Garcetti

is reflected in the test derived from those cases.  In determining whether a government

employee's expressive conduct involves a "matter of public concern," a reviewing court must

examine the content of that speech.  See Connick, 461 U.S. at 147-48 ("Whether an employee's

speech addresses a matter of public concern must be determined by the content, form, and

context of a given statement, as revealed by the whole record."); Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001) ("A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community.").  If the court determines that the content of the speech relates to a matter of public concern, it must then weigh the importance of the particular ideas articulated in order to determine whether the employee's interest in disseminating them outweighs the employer's interest in limiting such expression.  See City of San Diego v. Roe, 543 U.S. 77, 82 (2004) (stating that the employee's interest in free expression should receive greater weight in cases involving "informed opinions on important public issues"); Rust v. Sullivan, 500 U.S. 173, 213 (1991) (Blackmun, J., dissenting) ("At the least, such conditions require courts to balance the speaker's interest in the message against those of government in preventing its dissemination.") (emphasis added).

In sum, both Pickering and Garcetti involved content-based restrictions on government employee speech, and the test derived from those cases specifically requires an inquiry into the content of the expressions at issue in any given case.  That test is inapplicable to content-neutral limitations on government employee speech.  Such limitations have nothing to do with whether the employee's speech relates to a matter of public concern, much less whether the particular ideas articulated are sufficiently important to tip the balance of interests in favor of the employee's effort to express them.  Therefore, the Court holds that the constitutionality of content-neutral limitations on the time, place, and manner in which a government employee may engage in expressive conduct – along with the validity of any disciplinary measures to which the

employee is subjected for violating those limitations – must be analyzed under the test

traditionally applied to such restrictions, which will be discussed below.[6]

That holding draws support from the fact that the Supreme Court has only used the

Pickering/Garcetti test in cases where a government employee was disciplined based on the

content of his or her speech.  See, e.g., Tenn. Secondary Sch. Athletic Ass'n v. Brentwood

Acad., 551 U.S. 291, 300 (2007) (upholding ban prohibiting high school athletics coaches from

recruiting middle school players based on concern that the content of such speech – namely,

"hard-sell tactics" – "could lead to exploitation, distort competition between high school teams,

and foster an environment in which athletics are prized more highly than academics."); San

Diego, 543 U.S. at 84-85 (ruling that the termination of a police officer for making pornographic

videos in which he was featured wearing a generic police uniform did not violate the First

Amendment because the content of those videos did not relate to a matter of public concern);

Rankin v. McPherson, 483 U.S. 378, 392 (1987) (holding that a public employee could not be

terminated for remarking, "if they go for him again, I hope they get him," during a private

---

[6] It is likely that Mr. Policastro's speech would be unprotected under the Pickering/Garcetti test. Although the memoranda he distributed on April 2, 2009 included information on teacher salaries in neighboring school districts – an issue that arguably brushes on matters of public concern – it is clear from the context of this case that the inclusion of that information was only a pretext for his true goal:  willfully violating the mailbox policy in order to provoke a reprimand that could be used as the basis for another lawsuit.  The banner headline Mr. Policastro included on his memoranda (in which he advertised his insubordination), and the e-mail he sent to local newspaper reporters (which made no mention of the wage disparity, but argued that the mailbox policy is unconstitutional) reveal that his speech was directed at a private effort to propel his complaints about the mailbox policy back into court rather than any effort to educate the public about the differences between teacher salaries in Tenafly and Teaneck.  Moreover, Defendants have presented evidence that Mr. Policastro's interest in distributing the memoranda through the teacher mailboxes was outweighed by their interest in prohibiting him from doing so.  In light of the disturbances caused by his March 13, 2002 memoranda, along with the fact that he could have used the e-mail system established by the school to distribute the April 2, 2009 communication out of which this case arises without seeking prior permission, it is unlikely that Mr. Policastro would be able to rebut the presumption in favor of the policy's constitutionality created by that evidence.

conversation relating to an attempted assassination of the President of the United States).

Similarly, the Court of Appeals has used the Pickering/Garcetti test only in cases involving

content-based restrictions.  See, e.g., Gorum v. Sessoms, 561 F.3d 179, 186 (3d Cir. 2009)

(holding that statements by a university professor in support of a student during a disciplinary

hearing were not protected by the First Amendment because the professor's appearance at that

hearing was made pursuant to his official duties, and therefore termination of the professor based

on the content of those statements did not violate his constitutional rights); Reilly v. City of

Atlantic City, 532 F.3d 216, 231-32 (3d Cir. 2008) (affirming district court judgment that police

officer's testimony implicating other members of the police department in various criminal

wrongdoing was protected by the First Amendment because that testimony was not given

pursuant to officer's official duties); Foraker v. Chaffinch, 501 F.3d 231, 243 (3d Cir. 2007)

(affirming district court ruling that First Amendment did not protect complaints by police

officers about conditions at a training facility because those statements were made as part of their

official duties); Springer v. Henry, 435 F.3d 268, 278-79 (3d Cir. 2006) (ruling that an

independent contractor working for a state agency could not be disciplined based on statements

made in a series of memoranda critical of the agency's policies, procedures, and administration).

####        iv.        *Time, Place, and Manner Limitations*

Content-neutral limitations on the time, place, and manner in which an individual may

engage in expressive conduct are analyzed under a separate test.  See, e.g., Thomas, 534 U.S. at

323-24; Ward, 491 U.S. at 791; Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293

(1984).  Such restrictions "are valid provided that they are justified without reference to the

content of the regulated speech, that they are narrowly tailored to serve a significant

governmental interest, and that they leave open ample alternative channels for communication of the information." Clark, 468 U.S. at 293.

In Perry Educational Association v. Perry Local Educators' Association, 460 U.S. 37 (1983), the Supreme Court dealt specifically with whether the First Amendment requires schools to provide unlimited and equal access to teacher mailboxes. The Court held that it does not, and sustained a mailbox restriction that prohibited the dissemination of materials by one teachers' union but allowed use by another, stating:

> The First Amendment's guarantee of free speech applies to teacher's mailboxes as surely as it does elsewhere in the school and on sidewalks outside. But this is not to say that the First Amendment requires equivalent access to all parts of a school building in which some form of communicative activity occurs. Nowhere have we suggested that students, teachers, or anyone else has an absolute right to use all parts of a school building or its immediate environs for unlimited expressive purposes.

Id. at 44 (internal citations omitted).

As explained in Perry, the question of whether administrators may deny teachers and students the right to access a particular part of the school property for the purposes of speaking depends on whether that area is of the type that has traditionally been used for such expression. Id. School administrators may not regulate the time, place, and manner of speech in a "public forum" – meaning either an area that has traditionally been used for "assembly and debate" or one that the government has specifically opened to speech by some group or individual – unless they comply with the requirements set forth above that such restrictions be content-neutral, narrowly-tailored, and allow alternative channels for communication. Id. at 44-45. In contrast, school officials may restrict the use of any area that is not a "public forum" as they see fit. Id. at 53 ("[W]hen government property is not dedicated to open communication the government may

– without further justification – restrict use to those who participate in the forum's official business.").

The Supreme Court held in <u>Perry</u> that a school's "internal mail system is not a public forum."  <u>Id.</u>  The Court of Appeals specifically applied that ruling to the Tenafly High School teacher mailboxes in one of its decisions relating to Mr. Policastro's earlier suit.  <u>Policastro v. Kontogiannis</u>, 2005 WL 1005131 at *2 (3d Cir. 2005) ("When, as in this case, the forum for the speech is a school internal mail box, the forum is considered non-public.").  Accordingly, this Court must follow the standard applicable to non-public fora in determining whether the mailbox policy was a valid time, place, and manner restriction.

Under that standard, the restrictions imposed by the mailbox policy were constitutional and Mr. Policastro's speech in violation of that policy was not protected.  As was the case in <u>Perry</u>, there is no indication that the mailbox policy was "intended to discourage one viewpoint and advance another."  460 U.S. at 49.  To the contrary, it is undisputed that the mailbox policy applied equally to all teachers at the school regardless of the views expressed in their communications.

Nor was that policy unreasonable in light of the function served by the teacher mailboxes and, in a broader sense, the school itself.  <u>Id.</u> ("The touchstone for evaluating [the validity of time, place, and manner restrictions on use of non-public fora] is whether they are reasonable in light of the purpose which the forum at issue serves.").  Just as the restrictions in <u>Perry</u> "serve[d] to prevent the District's schools from becoming a battlefield for inter-union squabbles," <u>id.</u> at 52, the ones in this case attempt to minimize disturbances and ensure that the school's teachers remain focused on their mission:  educating students.  The need for such a policy has been repeatedly confirmed by Mr. Policastro's own actions.  His March 13, 2002 memoranda caused

widespread consternation among the teachers and led to an argument in the library. While there is no evidence that his April 2, 2009 memoranda resulted in a disturbance of similar severity, Mr. Policastro's actions most certainly created a distraction that shifted both his focus and that of school administrators away from their normal duties. Rather than spend the afternoon of April 2, 2009 grading papers, devising lesson plans, or teaching, Mr. Policastro dedicated at least part of that day to drafting the lengthy e-mail quoted above, in which he described his decision to disobey the mailbox policy. He then transmitted the e-mail to every other teacher at the school (along with local newspaper reporters), thus spreading the disruption caused by his actions.

Finally, there were "substantial alternative channels" by which Mr. Policastro could have conveyed his message. Id. at 53. Like the union that was prohibited from using the teacher mailboxes in Perry, Mr. Policastro has not shown that his "ability to communicate with [other] teachers is seriously impinged by the restricted access to the internal mail system." Id. To the contrary, he admits that he could have used the e-mail system established by Defendants in order to send any communication involving any subject matter to any other teacher at any time – without seeking permission before doing so.

The aforementioned similarities between this case and Perry compel the conclusion that Mr. Policastro's speech in violation of the mailbox policy was not protected by the First Amendment. Therefore, the Defendants did not subject him to "the deprivation of any rights, privileges, or immunities secured by the Constitution," 42 U.S.C. § 1983, by reprimanding him for that speech, and his remaining claims must be dismissed.

**C.  "Letters of the Carrier"**

As a final matter, Mr. Policastro argues that the reprimand he received for distributing his April 2, 2009 memoranda violated his rights because those communications were protected as "letters of the carrier."  That argument is unavailing.

The provision invoked by Mr. Policastro in support of his argument, 39 C.F.R. § 310.3(b)(1), is a regulation issued by the United States Postal Service (the "Postal Service"). The regulation itself does not have the force of law, but sets forth the Postal Service's interpretation of an obscure series of Congressional Acts commonly known as the "Private Express Statutes," 18 U.S.C. §§ 1693-1699, 39 U.S.C. §§ 601-606.  Those "statutes establish a postal monopoly and generally prohibit the private carriage of letters over postal routes without the payment of postage to the [] Postal Service."  Regents of the Univ. of Cal. v. PERB, 485 U.S. 589, 591 (1988).  As an exception to that general prohibition, 18 U.S.C. § 1964 authorizes the private carriage of "letters or packets" that "relate to the current business of the carrier."  Thus, an individual may deliver his or her own letters without violating the Private Express Statutes.

The fact that Mr. Policastro did not violate the Private Express Statutes by hand-distributing his memoranda without first seeking permission does not, however, mean that he had a First Amendment right to do so.  The Private Express Statutes govern only the narrow question of who may engage in the practice of carrying mail, meaning the conveyance of letters or parcels "at stated periods on any post route, or from one place to another between which mail is regularly carried."  18 U.S.C. § 1964.  Whether the speech contained in a given piece of mail falls outside the protections of the First Amendment – either because its content places it in an unprotected category of expression or because the manner in which it occurs violates a valid time, place, and manner limitation – is a separate inquiry.  For example, an individual who

transmitted materials defaming the character of another by sending them via the Postal Service would not violate the Private Express Statutes, but his speech would not be subject to the First Amendment.  Similarly, the hand-delivery of an explosive device by its maker would fall under the "letters of the carrier" exception, but few would contend that such actions were constitutionally protected.  Therefore, the Court rejects Mr. Policastro's claim that the reprimand he received for violating the mailbox policy was unconstitutional because his April 2, 2009 memoranda were "letters of the carrier."

### III.  CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is granted. Mr. Policastro's cross-Motion for Summary Judgment is denied, and his remaining claims are dismissed with prejudice.

 **_s/ Dickinson R. Debevoise_**
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated:  May 7, 2010